UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JAMONE WEST,

PLAINTIFF

- AGAINST -

AMY LAMANNA, Superintendent of Five Points Correctional Facility;
T.E. DELMAR, Deputy Superintendent for Security at Five Points Correctional Facility;
K.C. SCHREINER, Correction Officer at Five Points Correctional Facility;
NICHOLAS SUED, Correction Officer at Five Points Correctional Facility;
SHAWN COVNEY, Correction Officer at Five Points Correctional Facility;
MATTHEW FORD, Correction Officer at Five Points Correctional Facility;
S. BRADBURY, Correction Officer at Five Points Correctional Facility;
P. SCHMITT, Correction Officer at Five Points Correctional Facility;
D. ELLIS, Correction Officer at Five Points Correctional Facility;
W.R. ROWLAND, Correction Officer at Five Points Correctional Facility;
CONNOR O'MALLEY, Correction Officer at Five Points Correctional Facility;
MATT MATWIEJOW, Correction Officer at Five Points Correctional Facility;
KEVIN OLSON, Correction Officer at Five Points Correctional Facility;
J. HOUSEMAN, Investigator at the New York State Department of Corrections and Community Supervision Office of Special Investigations;

DEFENDANTS.

**COMPLAINT AND JURY DEMAND**

25 Civ. 6378

Plaintiff JAMONE WEST ("MR. WEST"), by and through his attorneys, ZMO Law PLLC, as and for his Complaint, hereby alleges as follows based on information and belief:

1. On three occasions in 2022, security staff at Five Points Correctional Facility ("Five Points CF") violently assaulted MR. WEST, causing a permanent disfiguring injury to his shoulder, ongoing migraine headaches, and other long-term medical problems. The attacks were captured on videos released in July 2025 to counsel pursuant to a New York Freedom of Information Law request. The videos show an appalling, unprovoked assault in which officers are seen and heard threatening to spray MR. WEST, slamming him into a wall, pressing their weight into the side of his head through their knee, repeatedly striking and kicking him, and violently placing him in a *strappado* pose where his cuffed arms are lifted above his head and nearly pulled out of their sockets. After the first incident, officials unlawfully held MR. WEST in a special solitary confinement cell where he was denied access to sanitary facilities for three consecutive days. It is apparent from the videos that these three attacks were wanton, malicious, unjustified, for no penological purpose, and calculated solely to inflict pain on MR. WEST.

2. MR. WEST brings this civil rights action under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution against various officials of the New York State Department of Corrections and Community Supervision ("DOCCS") who, under color of state law, violated his right to be free from cruel and unusual punishment. Both security staff and DOCCS supervisory officials are liable for

MR. WEST's injuries because officials created and maintained a culture of impunity, were aware of the imminent threat of a violent assaults against MR. WEST at the hands of correction officers, failed to intervene, and deliberately failed to protect him. All Defendants' unlawful conduct violated the Eighth Amendment prohibition against cruel and unusual punishment and caused MR. WEST serious physical and psychological illness and injury.

## BACKGROUND

3. Five Points CF is a maximum security, all-male facility located in the Town of Romulus, Seneca County, State of New York.

4. Five Points CF has a total capacity of 1,500 incarcerated individuals.

5. Five Points CF is operated by DOCCS.

6. During his incarceration at Five Points CF, MR. WEST was subjected to violent physical abuse at the hands of DOCCS officials.

7. DOCCS officials filed pretextual disciplinary tickets against MR. WEST to both cover up their own wrongdoing and to interfere with MR. WEST's ability to seek redress using otherwise available administrative remedies in the prison.

8. In 2022, MR. WEST was the victim of three separate gang assaults by DOCCS correction officers in July and November, respectively.

9. The July 2022 assault dislocated MR. WEST's right shoulder and rendered him disfigured.

10. The two assaults in November compounded the shoulder injury, leaving him permanently disfigured.

11. MR. WEST was subjected to pretextual disciplinary actions after all three assaults.

12. MR. WEST was released on parole on December 10, 2024.

13. MR. WEST now brings suit under the Eighth and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983 to recover damages for the harm caused by his violent abuse at the hands of New York prison officials.

## JURISDICTION AND VENUE

14. Subject matter jurisdiction over the federal constitutional and statutory claims is valid in this Court pursuant to 28 U.S.C. § 1331.

15. This Court has jurisdiction to award nominal, compensatory, and punitive damages, attorneys' fees and costs, and injunctive and declaratory relief pursuant to 28 U.S.C. § 2201 and 42 U.S.C. §§ 1983 and 1988.

16. DOCCS operates Five Points CF, a prison where the conduct took place, in Romulus, Seneca County, State of New York.

17. Five Points CF is in the Western District of New York.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred inside the Western District of New York.

## JURY DEMAND

19. MR. WEST respectfully demands a trial by jury on all issues and claims set forth in this Complaint pursuant to the Seventh Amendment of the United States Constitution and Fed. R. Civ. P. 38(b).

## PARTIES

20. Plaintiff JAMONE WEST is no longer in custody and now resides in Rochester, New York. During the relevant time periods, MR. WEST was incarcerated at Five Points CF under the direct control and supervision of DOCCS officials.

21. Defendant AMY LAMANNA ("SUPT. LAMANNA") was, at all relevant times, the Superintendent of Five Points CF. SUPT. LAMANNA is sued in her individual capacity.

22. SUPT. LAMANNA was the chief administrative officer of Five Points CF.

23. As such, SUPT. LAMANNA was legally responsible for the management and supervision of the facility and for directing the work and defining the responsibilities of all the employees of the facility.

24. As the Superintendent of Five Points CF, SUPT. LAMANNA was at all relevant times the legal custodian of Plaintiff.

25. Defendant T.E. DELMAR ("D.S.S. DELMAR") was, at all relevant times, a Deputy Superintendent for Security at Five Points CF. D.S.S. DELMAR is sued in his individual capacity.

26. Defendants K.C. SCHREINER ("C.O. SCHREINER"), NICHOLAS SUED ("C.O. SUED"), SHAWN COVNEY ("C.O. COVNEY"), MATTHEW FORD ("C.O. FORD"), S. BRADBURY ("C.O. BRADBURY"), W.R. ROWLAND ("C.O. ROWLAND"), CONNOR O'MALLEY ("C.O. O'MALLEY"), MATT MATWIEJOW ("C.O. MATWIEJOW"), and KEVIN OLSON ("C.O. OLSON") were, at all relevant times, correction officers at Five Points CF. They are sued in their individual capacities.

27. P. SCHMITT ("SGT. SCHMITT") and D. ELLIS ("SGT. ELLIS") were at all relevant times sergeants at Five Points CF. They are sued in their individual capacities.

28. Defendant J. HOUSEMAN ("INVESTIGATOR HOUSEMAN") is an individual who was, at all relevant times, an investigator at DOCCS's Office of Special Investigations ("OSI"). He is sued in his individual capacity.

## FACTUAL ALLEGATIONS

### I. FIVE POINTS CF AND THE "BEAT-UP CREW"

29. Five Points CF has capacity to house as many as 1,500 incarcerated people but, currently, houses approximately 1,200 people.

30. Five Points CF has five housing units or "blocks."

31. The cells in Five Points CF are secured with solid doors that contain a small window out of which incarcerated people can view the corridor outside their cell. Correction officers can cover the viewing windows from the outside of the cells.

32. Meals at Five Points CF are provided in a communal eating space known as the "mess hall" or "chow."

33. The facility also provides educational and vocational programs, religious programs, and a law library, among other programs.

34. For recreation, Five Points CF has a gym, weight room, large main yard ("the yard"), and a smaller "block yard" for each housing unit.

35. At certain times, inmates are required to share a cell, or "double bunk" with another inmate.

36. Virtually the entire prison is subject to full-time video surveillance. The surveillance extends to the inside of cells.

37. Five Points CF has a Special Housing Unit ("SHU") where inmates are isolated from the general prison population.

38. Inmates refer to SHU as "the Box."

39. Five Points CF has a room where inmates are isolated from the general population that inmates refer to as "the Shit Room."

40. In the Shit Room, only a bucket is provided in lieu of toilet facilities.

41. In the Shit Room, incarcerated people are forced to strip naked and permitted to wear only a hospital-style gown.

42. In the Shit Room, incarcerated people are subjected to constant surveillance by correction officers.

43. Throughout their stay in the Shit Room, incarcerated people are provided with only dry toilet paper and are denied the ability to wash themselves.

44. Five Points CF is home to an unofficial association of correction officers known as the "Beat-up Crew."

45. Members of the Beat-up Crew use physical violence to intimidate inmates and retaliate against them for perceived and supposed breaches of etiquette and discipline.

46. Members of the Beat-up Crew are known among the inmates of Five Points CF for inflicting serious injuries on those to whom they administer beatings.

## II. JAMONE WEST WAS ASSAULTED AND RETALIATED AGAINST BY FIVE POINTS CF SECURITY STAFF IN JULY AND NOVEMBER 2022.

### A. On July 22, 2022, MR. WEST was assaulted by officers who dislocated his shoulder and unlawfully placed him in the "Shit Room" for three days after he declined to submit to a dog sniff.

47. On the morning of July 22, 2022, MR. WEST was walking through one of the corridors in Five Points CF on his way to the yard.

48. As he was walking, MR. WEST encountered INVESTIGATOR HOUSEMAN, who was holding a dog by the leash.

49. MR. WEST knew that INVESTIGATOR HOUSEMAN was an official of OSI and not a Five Points CF correction officer.

50. INVESTIGATOR HOUSEMAN asked MR. WEST to put his hands on the wall and let the dog sniff him.

51. MR. WEST told INVESTIGATOR HOUSEMAN that he knew INVESTIGATOR HOUSEMAN was not a correction officer and, therefore, INVESTIGATOR HOUSEMAN did not have the authority to (i) order MR. WEST to put his hands on the wall or (ii) subject MR. WEST to a sniff search by a dog.

52. MR. WEST continued walking along the corridor towards the yard.

53. MR. WEST heard INVESTIGATOR HOUSEMAN call for assistance.

54. A group of correction officers within earshot of INVESTIGATOR HOUSEMAN's call for assistance responded by approaching MR. WEST.

55. MR. WEST encountered a group of three Five Points CF correction officers who were later identified as C.O. SCHREINER, C.O. FORD, and C.O. COVNEY.

56. C.O. SCHREINER asked MR. WEST to allow the dog handled by INVESTIGATOR HOUSEMAN to sniff him.

57. MR. WEST declined C.O. SCHREINER's request to allow himself to be sniffed by the dog handled by INVESTIGATOR HOUSEMAN.

58. C.O. SCHREINER and C.O. FORD asked MR. WEST to put his hands on the wall of the corridor.

59. MR. WEST declined C.O. SCHREINER's and C.O. FORD's request to put his hands on the wall of the corridor.

60. C.O. BRADBURY then joined the group of correction officers surrounding MR. WEST.

61. C.O. SCHREINER then issued a command to MR. WEST to put his hands on the wall of the corridor and communicated that she was issuing the command as a direct order.

62. C.O. SCHREINER threatened to mace MR. WEST if he did not comply with her order.

63. C.O. SCHREINER stated to MR. WEST "put your hands on the wall or I'm going to spray you."

64. MR. WEST complied with CO. SCHREINER's order to put his hands on the wall.

65. C.O. FORD and C.O. COVNEY approached MR. WEST while he had his hands on the wall in compliance with C.O. SCHREINER's order.

66. C.O. FORD grabbed MR. WEST's right arm as MR. WEST had his hands on the wall in compliance with C.O. SCHREINER's order.

67. C.O. COVNEY grabbed MR. WEST's left arm as MR. WEST had his hands on the wall in compliance with C.O. SCHREINER's order.

68. C.O. FORD and C.O. COVNEY then positioned MR. WEST's arms to his side and slammed MR. WEST into the wall of the corridor.

69. The force with which C.O. FORD and C.O. COVNEY slammed MR. WEST's body into the wall was so great that MR. WEST's head bounced off the concrete of the wall.

70. C.O. FORD then placed MR. WEST in a chokehold as C.O. COVNEY maintained a firm grip of MR. WEST's left-hand side.

71. C.O. COVNEY cut off MR. WEST's air supply through the chokehold he placed him in.

72. While maintaining his chokehold of MR. WEST, C.O. FORD threw MR. WEST onto the floor of the corridor.

73. While C.O. FORD maintained his chokehold of MR. WEST, C.O. COVNEY maintained his firm grip of MR. WEST and assisted C.O. FORD in throwing MR. WEST to the ground.

74. MR. WEST hit the concrete floor of the corridor with the combined force exerted by both C.O. FORD and C.O. COVNEY on his body.

75. C.O. FORD and C.O. COVNEY piled on top of MR. WEST as they threw him to the floor and exerted the full dead weight of their bodies on MR. WEST.

76. MR. WEST felt his right shoulder dislocate from its socket due to the force C.O. FORD and C.O. COVNEY used in throwing him to the ground.

77. C.O. FORD and C.O. COVNEY then proceeded to physically beat MR. WEST while he was on the floor after his shoulder had been dislocated.

78. MR. WEST offered no resistance to the correction officers as they beat him.

79. C.O. SCHREINER directed INVESTIGATOR HOUSEMAN to hold MR. WEST as C.O. FORD and C.O. COVNEY beat him as he offered no resistance.

80. C.O. SUED then joined C.O. FORD and C.O. COVNEY in beating MR. WEST while INVESTIGATOR HOUSEMAN held MR. WEST as he offered no resistance.

81. The correction officers administered physical blows to all parts of MR. WEST's body as he lay on the ground offering no resistance.

82. MR. WEST felt the correction officers forcibly grab, slap, punch, and kick all parts of his body as he lay on the ground offering no resistance.

83. C.O. FORD drove his knee into MR. WEST's head as MR. WEST lay on the ground offering no resistance to the officers beating him.

84. C.O. BRADBURY watched as the other correction officers beat MR. WEST and made no attempt to intervene.

85. C.O. SCHREINER then proceeded to cover the viewing windows of the cells on the corridor.

86. C.O. SCHREINER's purpose in covering the viewing windows was to prevent MR. WEST's fellow inmates from witnessing the illegal actions the correction officers subjected him to.

87. C.O. BRADBURY then yelled "Stop resisting" at MR. WEST even though MR. WEST was offering no resistance to the correction officers as they beat him.

88. C.O. BRADBURY's purpose in yelling "Stop resisting" at MR. WEST was to plant false ideas as to MR. WEST's behavior in the minds of the inmates along the corridor who could no longer see the correction officers beating MR. WEST.

89. C.O. BRADBURY then closed the viewing window of the remaining cell on the corridor adjacent to where the correction officers were beating MR. WEST.

90. C.O. BRADBURY's purpose in covering the viewing windows was to prevent MR. WEST's fellow inmates from witnessing the illegal actions the correction officers subjected him to.

91. After some time, the correction officers handcuffed MR. WEST, placing his hands behind his back, which exacerbated the pain he felt in his dislocated shoulder.

92. C.O. SCHREINER, C.O. FORD, C.O. COVNEY, C.O. SUED, C.O. BRADBURY, and INVESTIGATOR HOUSEMAN then brought MR. WEST through the hallways of Five Points CF and passed him off to different correction officers.

93. MR. WEST was brought to the medical unit for a brief examination and an x-ray.

94. After MR. WEST was seen by a nurse in the medical unit, another officer, SGT. SCHMITT, escorted MR. WEST from the medical unit to an isolation room known as the Shit Room.

95. People incarcerated at Five Points CF refer to the isolation room as the Shit Room because people held there are forced to defecate in a bucket.

96. Inmates in the Shit Room are forced to strip naked and don a hospital-style gown, with correction officers then subjecting them to constant surveillance to monitor their bladder and bowel movements.

97. Inmates in the Shit Room are monitored on camera throughout their confinement.

98. Supervisory officials at Five Points CF force incarcerated people in the Shit Room to defecate in a bucket for the purpose of demeaning and humiliating them.

99. During their confinement in the Shit Room, inmates are provided with only three pieces of toilet paper to wipe themselves after they defecate and are not allowed to wash themselves with water.

100. There is no penological reason for denying incarcerated people access to a toilet or sanitizing facilities.

101. MR. WEST complained to SGT. SCHMITT about the condition of his right shoulder and the ensuing pain while they were walking to the Shit Room.

102. SGT. SCHMITT was in a position to observe MR. WEST's right shoulder and his injured, disheveled physical appearance.

103. MR. WEST's right shoulder was visibly dislocated.

104. SGT. SCHMITT falsely told MR. WEST, in sum and substance, that there was nothing wrong with MR. WEST's right shoulder.

105. SGT. SCHMITT failed to report MR. WEST's physical appearance, including his visibly dislocated right shoulder, to any supervisor or commanding officer.

106. MR. WEST was held in the Shit Room without any toilet facilities for three days.

107. MR. WEST was exposed to demeaning and humiliating conditions by being forced to strip naked but for a hospital-style gown and pass excrement into a bucket in view of correction officers throughout the three days he was confined in the Shit Room.

108. During his confinement in the Shit Room, MR. WEST was provided with only three pieces of dry toilet paper to "clean" himself each time he passed a bowel movement and was denied any other facilities to wash himself.

109. The three pieces of toilet paper MR. WEST was provided with for each bowel movement were inadequate to clean himself.

110. MR. WEST experienced consequent discomfort and humiliation from the unsanitary conditions he was held in.

111. MR. WEST also noticed that, unlike usual custom and practice at Five Points CF, his confinement in the Shit Room was not recorded on camera.

112. The correction officers at Five Points CF did not make a video recording of MR. WEST's stay in the Shit Room to cover up and deny that it ever happened.

113. While he was held under humiliating conditions in the Shit Room, MR. WEST was not provided necessary medical care to tend to his right shoulder.

114. While he was held under humiliating conditions in the Shit Room, MR. WEST could feel that his right rotator cuff was injured.

115. MR. WEST struggled to put on and take off shirts following the assault and was unable to exercise following the assault.

116. A few days after the assault, INVESTIGATOR HOUSEMAN visited MR. WEST and recorded on an audio recording device MR. WEST's complaint about the physical assault MR. WEST received at the hands of C.O. SCHREINER, C.O. FORD, C.O. SUED, C.O. COVNEY, C.O. BRADBURY and INVESTIGATOR HOUSEMAN himself.

117. INVESTIGATOR HOUSEMAN took no further action in response to MR. WEST's complaint.

118. Also on July 22, 2022, C.O. SCHREINER issued a Tier III disciplinary ticket to MR. WEST for the following alleged infractions pursuant to 7 N.Y.C.R.R. § 270.2:

a. Breach of Rule 104.13: "An incarcerated individual shall not engage in conduct which disturbs the order of any part of the facility. This includes, but is not limited to, loud talking in a mess hall, program area or corridor, talking after the designated facility quiet time, playing a radio, television or tape player without a headphone or through a headphone in a loud or improper manner, or playing a musical instrument in a loud or improper manner."

b. Breach of Rule 107.10: "An incarcerated individual shall not physically or verbally obstruct or interfere with an employee at any time."

c. Breach of Rule 106.10: "AN INCARCERATED INDIVIDUAL SHALL OBEY ALL ORDERS OF DEPARTMENT PERSONNEL PROMPTLY AND WITHOUT ARGUMENT." (Emphasis in original.)

d. Breach of Rule 115.10: "An incarcerated individual shall comply with all frisk and search procedures."

119. C.O. SCHREINER issued this Tier III ticket to MR. WEST notwithstanding the fact that: (i) MR. WEST had not engaged in any behavior to disturb the corridors of Five Points CF; (ii) MR. WEST did not physically obstruct any DOCCS employee; and (iii) MR. WEST not only complied with C.O. SCHREINER's order to put his hands on the wall,

but also offered no resistance to the correction officers as they assaulted him and damaged his shoulder.

120. During the course of a hearing on or about August 5, 2022, MR. WEST was shown video footage of his July 22, 2022, beating at the hands of C.O. SCHREINER, C.O. FORD, C.O. SUED, C.O. COVNEY, C.O. BRADBURY and INVESTIGATOR HOUSEMAN.

121. While viewing the footage of his July 22, 2022, beating during the August 5, 2022, hearing, MR. WEST observed C.O. SCHREINER laughing as she watched the footage of MR. WEST's beating.

122. At the conclusion of the August 5, 2022, hearing, DOCCS found, without basis, that MR. WEST had been belligerent on July 22, 2022, and thus the correction officers were justified in their actions.

123. MR. WEST has suffered and continues to suffer emotional distress and physical illness as a result of the actions of DOCCS officials on July 22, 2022, and the subsequent confinement in the Shit Room.

124. MR. WEST has suffered and continues to suffer permanent disfigurement of his right shoulder and diminished physical capabilities as a result of the actions of DOCCS officials on July 22, 2022, and their failure to provide adequate medical treatment afterwards.

**B. On November 17, 2022, MR. WEST was transferred to a new cell where he was beaten twice by security staff.**

125. On November 17, 2022, MR. WEST was in his assigned cell ("the old cell") at Five Points CF.

126. MR. WEST's shoulder was tender from the damage that had been done to it during the July 22, 2022, beating.

127. Five Points CF had not provided MR. WEST with adequate medical treatment for his shoulder since the July 22, 2022, beating.

128. C.O. O'MALLEY then entered the old cell and requested that MR. WEST move to another cell ("the new cell").

129. C.O. O'MALLEY was reputed to be a member of the Beat-up Crew.

130. C.O. O'MALLEY had a reputation at Five Points CF for manipulating incarcerated people against each other and isolating particular individuals for abuse.

131. MR. WEST was frightened of C.O. O'MALLEY.

132. MR. WEST told C.O. O'MALLEY that he would comply with the request to move cells, but that he declined to share a cell with another inmate.

133. MR. WEST told C.O. O'MALLEY that he preferred not to "double bunk" due to his concerns about COVID-19 and other contagious diseases circulating among the prison population, unsanitary conditions, and the lack of medical care for inmates at Five Points CF.

134. C.O. O'MALLEY then escorted MR. WEST to the new cell along with C.O. OLSON, C.O. MATWIEJOW, C.O. ROWLAND, and SGT. ELLIS.

135. At the new cell, C.O. O'MALLEY told MR. WEST that he had to "double bunk" with another inmate.

136. MR. WEST again told C.O. O'MALLEY that he was declining the request to "double bunk" with another inmate.

137. MR. WEST cited concerns about COVID-19 and other contagious diseases among the prison population.

138. At that point, C.O. O'MALLEY, C.O. OLSON, and C.O. MATWIEJOW grabbed MR. WEST.

139. C.O. O'MALLEY, C.O. OLSON, and C.O. MATWIEJOW forced MR. WEST to the ground.

140. C.O. O'MALLEY, C.O. OLSON, and C.O. MATWIEJOW proceeded to physically beat MR. WEST.

141. MR. WEST offered no resistance to the correction officers as they beat him.

142. MR. WEST felt the correction officers forcibly grab, slap, punch, and kick all parts of his body.

143. MR. WEST did not resist while the officers were beating him.

144. During the beating, C.O. MATWIEJOW placed his booted foot on MR. WEST's head and exerted substantial force against MR. WEST's head.

145. MR. WEST did not pose any threat to the officers that were beating him and stomping on his head.

146. MR. WEST wriggled out from under C.O. MATWIEJOW's boot because he feared for his life.

147. MR. WEST screamed that the correction officers were causing him extreme pain.

148. MR. WEST cried and pleaded with the correction officers to stop hurting him.

149. C.O. ROWLAND watched C.O. O'MALLEY, C.O. OLSON, and C.O. MATWIEJOW beat MR. WEST as he lay on the ground offering no resistance and helplessly cried out in pain.

150. C.O. ROWLAND made no attempt to intervene to assist MR. WEST.

151. SGT. ELLIS watched C.O. O'MALLEY, C.O. OLSON, and C.O. MATWIEJOW beat MR. WEST as he lay on the ground offering no resistance and helplessly cried out in pain.

152. SGT. ELLIS made no attempt to intervene to assist MR. WEST.

153. SGT. ELLIS provided instruction to C.O. MATWIEJOW, C.O. OLSON, and C.O. O'MALLEY as they beat MR. WEST.

154. C.O. MATWIEJOW then placed handcuffs on MR. WEST.

155. C.O. MATWIEJOW and C.O. O'MALLEY then rose MR. WEST to his feet by jerking his wrists upwards, forcing MR. WEST to adopt a bent-over position resembling a *strappado* posture.

156. C.O. MATWIEJOW and C.O. O'MALLEY used more force than was necessary when they jerked MR. WEST's handcuffed wrists upward. The purpose of this action was to inflict pain on MR. WEST.

157. C.O. MATWIEJOW, C.O. O'MALLEY, C.O. OLSON, C.O. ROWLAND, and SGT. ELLIS then brought MR. WEST through the hallways of Five Points CF, forcing him to maintain this same bent-over position as he walked.

158. The position that the correction officers forced MR. WEST to adopt as he walked through the corridors of Five Points CF has been condemned as torture under international human rights law.[1]

159. C.O. MATWIEJOW, C.O. O'MALLEY, C.O. OLSON, C.O. ROWLAND, and SGT. ELLIS then escorted MR. WEST to the Special Housing Unit ("SHU") at Five Points CF which the inmates refer to as "the Box."

160. At the Box, the correction officers took photographs of MR. WEST's injuries.

161. MR. WEST's appearance in the photographs was consistent with that of someone who had been beaten and physically assaulted.

162. C.O. MATWIEJOW, C.O. O'MALLEY, C.O. OLSON, C.O. ROWLAND, and SGT. ELLIS then escorted MR. WEST to the external entrance to the new cell in the rec pen.

163. The correction officers placed MR. WEST in the cage outside the external cell door and removed the handcuffs restraining him.

164. MR. WEST remained standing against the wall of the cage.

165. C.O. O'MALLEY then grabbed MR. WEST and slammed him into the wall of the cage.

---

[1] *See, e.g.*, Jim Hentz, *Russia's feared prisons follow system from Soviet Gulag era*, ASSOCIATED PRESS, Apr. 20, 2021, https://apnews.com/article/moscow-russia-lifestyle-government-and-politics-hunger-strikes-f4a5097813642449f7ff678986d9a956. The illegal position is not technically a *strappado* because MR. WEST was not suspended by his wrists; rather it resembled a *strappado* because the officers roughly raised MR. WEST's wrists to force him to bend over and stress his shoulder.

166. C.O. O'MALLEY then proceeded to beat MR. WEST.

167. C.O. MATWIEJOW then joined C.O. O'MALLEY in beating MR. WEST.

168. C.O. OLSON then joined C.O. O'MALLEY and C.O. MATWIEJOW in beating MR. WEST.

169. MR. WEST offered no resistance to the correction officers as they physically beat him.

170. The correction officers administered physical blows to all parts of MR. WEST's body as he offered no resistance to the correction officers beating him.

171. MR. WEST felt the correction officers forcibly grab, slap, punch, and kick all parts of his body as he offered no resistance to the correction officers beating him.

172. C.O. ROWLAND watched C.O. O'MALLEY, C.O. OLSON, and C.O. MATWIEJOW beat MR. WEST as he lay on the ground offering no resistance and helplessly cried out in pain.

173. C.O. ROWLAND made no attempt to intervene to assist MR. WEST.

174. SGT. ELLIS watched C.O. O'MALLEY, C.O. OLSON, and C.O. MATWIEJOW beat MR. WEST as he lay on the ground offering no resistance.

175. SGT. ELLIS made no attempt to intervene to assist MR. WEST.

176. SGT. ELLIS provided instruction to C.O. MATWIEJOW, C.O. OLSON, and C.O. O'MALLEY as they beat MR. WEST.

177. C.O. MATWIEJOW, C.O. O'MALLEY, and C.O. OLSON then rose MR. WEST by forcibly pulling on his cuffed wrists.

178. C.O. MATWIEJOW, C.O. O'MALLEY, C.O. OLSON, C.O. ROWLAND, and SGT. ELLIS then brought MR. WEST through the hallways of Five Points CF in the bent over position described above.

179. C.O. MATWIEJOW, C.O. O'MALLEY, C.O. OLSON, C.O. ROWLAND, and SGT. ELLIS then escorted MR. WEST back to the Box.

180. While escorting MR. WEST, officers forced him to adopt the bent over position described above.

181. Later on November 17, 2022, C.O. ROWLAND issued a Tier III disciplinary ticket against MR. WEST alleging the following infractions pursuant to 7 N.Y.C.R.R. § 270.2:

a. Breach of Rule 104.11: "An incarcerated individual shall not engage in any violent conduct or conduct involving the threat of violence either individually or in a group."

b. Breach of Rule 107.10: "An incarcerated individual shall not physically or verbally obstruct or interfere with an employee at any time."

c. Breach of Rule 106.10: "AN INCARCERATED INDIVIDUAL SHALL OBEY ALL ORDERS OF DEPARTMENT PERSONNEL PROMPTLY AND WITHOUT ARGUMENT." (Emphasis in original.)

d. Breach of Rule 109.12: "An incarcerated individual shall follow all facility regulations and staff directions relating to movement within the facility. This includes, but is not limited to, seating, lock-in, call slip procedures, and all activities of a similar nature."

182. C.O. ROWLAND issued this Tier III ticket to MR. WEST notwithstanding the fact that: (i) MR. WEST had not engaged in any violent conduct or threatened the same; (ii) MR. WEST had not physically or verbally interfered with any DOCCS employee; (iii) no direct order had been issued by any correction officer; and (iv) MR.

WEST had offered no resistance to the correction officers as they beat him until he believed that C.O. MATWIEJOW was attempting to kill him by stomping on his head.

183. A few days after the assault, an investigator from OSI visited MR. WEST and recorded on an audio recording device MR. WEST's complaint about the physical assault on MR. WEST administered by C.O. O'MALLEY, C.O. ROWLAND, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS.

184. MR. WEST was never informed that any other action was taken in response to MR. WEST's complaint.

185. A disciplinary hearing concerning the Tier III disciplinary ticket issued by C.O. ROWLAND was scheduled before D.S.S. DELMAR.

186. MR. WEST requested that all audio and video recordings of his beating on November 17, 2022, be released to him.

187. At a December 1, 2022, disciplinary hearing, D.S.S. DELMAR sustained C.O. ROWLAND's Tier III disciplinary ticket against MR. WEST.

188. During the course of the December 1, 2022, hearing, MR. WEST was shown some video footage of his November 17, 2022, beating at the hands of the correction officers.

189. DOCCS purposely withheld some relevant footage of his November 17, 2022, beating at the hands of the correction officers to minimize and trivialize the severity of the harm he suffered.

190. MR. WEST appealed D.S.S. DELMAR's finding to DOCCS's Central Office in Albany, New York.

191. On February 6, 2023, DOCCS wrongfully affirmed C.O. ROWLAND'S Tier III disciplinary ticket against MR. WEST.

192. MR. WEST has suffered and continues to suffer emotional distress and physical illness as a result of the actions of DOCCS officials on November 17, 2022.

## III. SUPT. LAMANNA BY HER ACTIONS AND FAILURES TO ACT CREATED AN ENVIRONMENT IN DOCCS WHERE VIOLENT ABUSE BY STAFF WAS FREQUENT AND PREDATORY BEHAVIOR BY CORRECTION OFFICERS WAS TOLERATED.

193. As detailed in the following paragraphs, SUPT. LAMANNA was: (1) personally responsible for preventing physical abuse by guards against inmates, including MR. WEST; (2) on notice of the serious risk of physical abuse by guards faced by MR. WEST and other inmates incarcerated at Five Points CF; and (3) failed to enact and enforce policies that would have prevented officers from physically assaulting MR. WEST.

### A. SUPT. LAMANNA was responsible for preventing physical abuse at Five Points CF.

194. SUPT. LAMANNA was at all relevant times responsible for the safety of the inmates at Five Points CF.

195. SUPT. LAMANNA was at all relevant times responsible for creating and enforcing policies and practices that ensure the safety of inmates at Five Points CF.

196. SUPT. LAMANNA was physically present at Five Points CF.

197. SUPT. LAMANNA had operational control over the staff at Five Points CF.

198. SUPT. LAMANNA failed to implement policies or procedures to protect inmates from physical abuse at Five Points CF.

199. Despite repeated instances of custodial abuse at Five Points CF, SUPT. LAMANNA failed to enact or enforce policies to correct the pervasive custom of abuse at Five Points CF.

**B. SUPT. LAMANNA was aware of the substantial risks of custodial abuse faced by prisoners at Five Points CF.**

200. SUPT. LAMANNA was aware that the risk and numerous incidents of physical abuse of inmates at the hands of prison guards led the federal government, the District of Columbia, and all fifty states to enact many reforms to protect inmates.

201. SUPT. LAMANNA knew that custodial physical abuse continued to be a pervasive problem at Five Points CF in 2022, including the excessive and unlawful use of chemical irritants by correction officers on incarcerated people.

202. The Correctional Association of New York reported 173 incidents of Five Points CF staff using chemical irritants on incarcerated people in 2022. This followed: 100 such incidents in 2018; 121 such incidents in 2019; 131 such incidents in 2020; and 90 such incidents in 2021. The trend represents an astronomical explosion in Five Points CF staff reported use of chemical irritants on incarcerated people during SUPT. LAMANNA's tenure, given that only one such incident occurred throughout the entire 2014 – 2017 timeframe.

203. SUPT. LAMANNA, during her tenure, subjected the incarcerated people in her care at Five Points CF to chemical irritants at levels unprecedented in recent years.

204. SUPT. LAMANNA was aware that the risk and incidents of physical abuse in a prison setting led to the promulgation of international standards prohibiting corporal

punishment. *See, e.g.*, United Nations Standard Minimum Rules for the Treatment of Prisoners, Rule 43 § 1(d), adopted on Dec. 17, 2015.

205. The failure of SUPT. LAMANNA to implement and enforce policies and practices that would actually prevent and punish all physical abuse by staff contributed to a hostile prison culture and increased the risk of physical abuse of prisoners, including MR. WEST.

### C. SUPT. LAMANNA failed to enact supervisory policies that would prevent physical abuse by staff and failed to enforce existing policies.

206. Despite known risks and frequent incidents of physical abuse by staff, SUPT. LAMANNA through her policies and practices (or lack thereof) recklessly disregarded these risks and failed to protect the prisoners in her custody from harm, including MR. WEST.

207. SUPT. LAMANNA inadequately supervised corrections staff, placing MR. WEST at a heightened risk of physical abuse.

208. SUPT. LAMANNA failed to enact appropriate rules and policies concerning the behavior of staff and failed to enforce existing rules and policies governing staff behavior.

#### 1. SUPT. LAMANNA created a culture and custom at Five Points CF where warning signs of physical abuse were ignored.

209. SUPT. LAMANNA failed to enact adequate rules and policies to monitor and discipline staff engaged in behavior that constituted warning signs of abuse.

210. SUPT LAMANNA knew that on December 28, 2021, C.O. GLEASON of Five Points CF subjected MR. WEST to the following racial and homophobic abuse:—

> "Yeah my N-----!! You look gay!! You look like you take a dick in your butt!"

211. MR. WEST submitted a grievance concerning the above incident on January 10, 2022.

212. On February 23, 2022, SUPT. LAMANNA denied MR. WEST'S grievance.

213. SUPT. LAMANNA's denial directly contributed to a culture of toleration of abusive behavior by guards and put MR. WEST personally at risk of harm.

214. SUPT. LAMANNA created a culture and custom of ignoring or overlooking abuse of inmates by correction officers.

215. Despite publicly promulgating policies against abusive behavior, the complete lack of enforcement of these policies made clear to DOCCS staff that they were under no real duty to report warning signs of abuse.

216. It was widely known to DOCCS correction officers and staff that they would not be disciplined or even informally counseled or reprimanded for failing to report abuse of incarcerated people by correction officers.

217. SUPT. LAMANNA tolerated and encouraged a culture of silence on the issue.

218. In instances of correction officer misconduct, including criminal cases and many other *unprosecuted* cases in that period, officers at DOCCS facilities knew about physical abuse of incarcerated people at the hands of officers and staff and failed to report them.

219. Not a single DOCCS staff member has been disciplined, punished or terminated from employment based solely on a failure to report suspected physical abuse of an incarcerated person.

### 2. SUPT. LAMANNA failed to create or enforce policies to remove correction officers who abused MR. WEST.

220. SUPT. LAMANNA failed to enact or enforce policies to remove correction officers from inmates in situations where it was discovered that the correction officers had abused particular incarcerated people.

221. Staff who were the subject of credible and repeated allegations of physical abuse were allowed to continue their usual posts.

222. Such staff were even permitted to continue to guard or to have contact or proximity with the prisoner who had complained about that officer.

223. DOCCS's repeated failure to remove officers from incarcerated people they were alleged to have abused emboldened other staff members to engage in similar behavior and discouraged other staff from making complaints about misbehavior.

224. Allowing these officers to remain in their posts with the same privileges and power over incarcerated people, at times monitoring their own alleged victims, conveyed to DOCCS staff that any written policies to the contrary would not be enforced unless overwhelming corroboration existed.

**3. SUPT. LAMANNA created a culture of intimidation and fear at Five Points CF where inmates lacked confidentiality in reporting incidents of physical abuse, feared retaliation, and did not think they would be believed.**

225. SUPT. LAMANNA created a culture of intimidation when she failed to provide inmates with a confidential way of reporting incidents of physical abuse.

226. Inmates were aware that reporting what had happened to them could result in retaliation by DOCCS staff and at Five Points CF, compounding the abuse they had already suffered as a result of policies more likely to perpetuate physical abuse than to prevent it.

227. Physical abuse complaints at DOCCS facilities were not treated as confidential.

228. Correction officers frequently exchanged and spread information about physical abuse of inmates.

229. No policy was enforced at Five Points CF to deter correction officers from spreading supposedly confidential information.

230. Inmates knew that their complaints would not be kept confidential, and that they would be risking retaliation.

231. Inmates knew that they were likely to be unfairly disbelieved or discredited if they reported physical abuse by staff.

232. SUPT. LAMANNA, by failing to enact or enforce sufficient policies, created a culture in which inmates' complaints were discouraged and disbelieved.

## FIRST CAUSE OF ACTION

## CRUEL AND UNUSUAL PUNISHMENT: EXCESSIVE FORCE—VIOLATION OF U.S. CONST. AMENDMENT VIII—C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, AND INVESTIGATOR HOUSEMAN—JULY INCIDENT

233. Paragraphs 1–232 are hereby incorporated and realleged.

234. The physical assault by C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, and INVESTIGATOR HOUSEMAN on July 22, 2022, was unauthorized, unlawful, and applied maliciously and sadistically for the very purpose of causing MR. WEST physical injury, severe pain, and humiliation.

235. By physically assaulting MR. WEST on July 22, 2022, C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, and INVESTIGATOR HOUSEMAN acted willfully and wantonly, recklessly, and with depraved indifference to MR. WEST's life.

236. There was no penological justification for the July 22, 2022, conduct of C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, and INVESTIGATOR HOUSEMAN.

237. The conduct of C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, and INVESTIGATOR HOUSEMAN was unreasonable and in violation of MR. WEST's clearly established constitutional right to be free from cruel and unusual punishment.

238. The July 22, 2022, conduct of C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, and INVESTIGATOR HOUSEMAN constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

## SECOND CAUSE OF ACTION

## CRUEL AND UNUSUAL PUNISHMENT: EXCESSIVE FORCE—VIOLATION OF U.S. CONST. AMENDMENT VIII—C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, AND SGT. ELLIS—FIRST NOVEMBER INCIDENT

239. Paragraphs 1–238 are hereby incorporated and realleged.

240. The first physical assault by C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS on November 17, 2022, was unauthorized, unlawful, and applied maliciously and sadistically for the very purpose of causing MR. WEST physical injury and harm.

241. By physically assaulting MR. WEST on November 17, 2022, C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS acted willfully and wantonly, recklessly, and with depraved indifference to MR. WEST'S life.

242. There was no penological justification for the November 17, 2022, conduct of C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS.

243. The conduct of C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS was unreasonable and in violation of MR. WEST's clearly established constitutional right to be free from cruel and unusual punishment.

244. The November 17, 2022, conduct of C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

## THIRD CAUSE OF ACTION

## CRUEL AND UNUSUAL PUNISHMENT: EXCESSIVE FORCE—VIOLATION OF U.S. CONST. AMENDMENT VIII—C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, AND SGT. ELLIS—SECOND NOVEMBER INCIDENT

245. Paragraphs 1–244 are hereby incorporated and realleged.

246. The second physical assault by C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS on November 17, 2022, was unauthorized, unlawful, and applied maliciously and sadistically for the very purpose of causing MR. WEST physical injury and harm.

247. By physically assaulting MR. WEST on November 17, 2022, C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS acted willfully and wantonly, recklessly, and with depraved indifference to MR. WEST'S life.

248. There was no penological justification for the November 17, 2022, conduct of C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS.

249. The conduct of C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS was unreasonable and in violation of MR. WEST's clearly established constitutional right to be free from cruel and unusual punishment.

250. The November 17, 2022, conduct of C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS constituted cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution.

## FOURTH CAUSE OF ACTION

## CONSPIRACY TO VIOLATE U.S. CONST. AMENDMENT VIII RIGHTS TO FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT—C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, AND INVESTIGATOR HOUSEMAN

251. Paragraphs 1–250 are hereby incorporated and realleged.

252. On July 22, 2022, C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, and INVESTIGATOR HOUSEMAN conspired to violate MR. WEST's rights under the Eighth Amendment of the U.S. Constitution to freedom from cruel and unusual punishment.

253. C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, C.O. BRADBURY, and INVESTIGATOR HOUSEMAN, by their actions, engineered a scenario whereby MR. WEST was in a defenseless position with his hands against the wall of the corridor of Five Points CF.

254. INVESTIGATOR HOUSEMAN requested that MR. WEST consent to a sniff-search by the dog he was handling as pretext for requesting assistance from C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, and C.O. BRADBURY.

255. Such conduct caused serious psychological and emotional pain and suffering, physical illness, and otherwise caused damage to MR. WEST for which Defendants are liable.

## FIFTH CAUSE OF ACTION

## CONSPIRACY TO VIOLATE U.S. CONST. AMENDMENT VIII RIGHTS TO FREEDOM FROM CRUEL AND UNUSUAL PUNISHMENT—C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, AND SGT. ELLIS

256. Paragraphs 1–255 are hereby incorporated and realleged.

257. On November 17, 2022, C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS conspired to violate MR. WEST's rights under the Eighth Amendment of the U.S. Constitution to freedom from cruel and unusual punishment.

258. C.O. ROWLAND, C.O. O'MALLEY, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS, by their actions, engineered a scenario whereby MR. WEST was in a defenseless position in his cell.

259. C.O. O'MALLEY requested that MR. WEST consent to double bunking as pretext for requesting assistance from C.O. ROWLAND, C.O. MATWIEJOW, C.O. OLSON, and SGT. ELLIS.

260. Such conduct caused serious psychological and emotional pain and suffering, physical illness, and otherwise caused damage to MR. WEST for which Defendants are liable.

## SIXTH CAUSE OF ACTION

## DELIBERATE INDIFFERENCE—VIOLATION OF U.S. CONST. AMENDMENT VIII—INVESTIGATOR HOUSEMAN

261. Paragraphs 1–260 are hereby incorporated and realleged.

262. INVESTIGATOR HOUSEMAN was personally aware of the imminent risk to MR. WEST posed by C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, and C.O. BRADBURY.

263. INVESTIGATOR HOUSEMAN failed to take any steps to protect MR. WEST from C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, and C.O. BRADBURY.

264. As a result of INVESTIGATOR HOUSEMAN's failure to act, C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, and C.O. BRADBURY subjected MR. WEST to illegal physical abuse after INVESTIGATOR #1 learned of the risk to MR. WEST that C.O. SCHREINER, C.O. SUED, C.O. COVNEY, C.O. FORD, and C.O. BRADBURY posed.

**SEVENTH CAUSE OF ACTION**

**DELIBERATE INDIFFERENCE—VIOLATION OF U.S. CONST. AMENDMENT VIII— SUPT. LAMANNA AND SGT. SCHMITT**

265. Paragraphs 1–264 are hereby incorporated and realleged.

266. SUPT. LAMANNA and SGT. SCHMITT were personally aware of the existence of "the Shit Room."

267. SUPT. LAMANNA and SGT. SCHMITT were personally aware that "the Shit Room" did not contain a toilet.

268. SUPT. LAMANNA and SGT. SCHMITT were personally aware that MR. WEST would be required to use a bucket to relieve himself during his time in "the Shit Room."

269. SUPT. LAMANNA and SGT. SCHMITT were personally aware that MR. WEST would be exposed to his own feces and unsanitary bodily excretions until he was released from "the Shit Room."

270. SUPT. LAMANNA and SGT. SCHMITT failed to take any steps to protect MR. WEST from the demeaning and degrading treatment, and the cruel and unusual punishment, that a stay in "the Shit Room" of Five Points CF encompasses.

271. As a result of the failure to act by SUPT. LAMANNA and SGT. SCHMITT, MR. WEST suffered psychological and emotional anguish, physical illness, and other damages caused by his period of confinement in "the Shit Room".

## EIGHTH CAUSE OF ACTION

## PROCEDURAL DUE PROCESS—VIOLATION OF U.S. CONST. AMENDMENTS VIII AND XIV—C.O. ROWLAND AND D.S.S. DELMAR

272. Paragraphs 1–271 are hereby incorporated and realleged.

273. After the November 17, 2022, assault against MR. WEST, C.O. ROWLAND filed false charges against MR. WEST, and DOCCS then conducted sham investigations and a deficient hearing into those charges.

274. D.S.S. DELMAR violated MR. WEST's constitutional rights to procedural due process by failing to assist MR. WEST in establishing a defense against the false charges, failing to investigate C.O. ROWLAND's false charges against MR. WEST, and sustaining C.O. ROWLAND's false charges against MR. WEST.

275. As a result of the violation of MR. WEST's constitutional rights by D.S.S. DELMAR and C.O. ROWLAND, MR. WEST was sentenced to 75 days' confinement in the Special Housing Unit, "the Box," without due process of law and suffered psychological and emotional anguish, physical illness, and other damages.

## NINTH CAUSE OF ACTION

## DELIBERATE INDIFFERENCE—VIOLATION OF U.S. CONST. AMENDMENT VIII—SUPT. LAMANNA

276. Paragraphs 1–275 are hereby incorporated and realleged.

277. SUPT. LAMANNA was aware that correction officers at DOCCS facilities, including at Five Points CF, were repeatedly accused, charged, and criminally convicted of physically abusing inmates.

278. SUPT. LAMANNA was directly and personally responsible for the safety of inmates at Five Points CF.

279. SUPT. LAMANNA failed to implement and enforce policies sufficient to protect inmates at Five Points CF from physical abuse by correction officers.

280. SUPT. LAMANNA created a custom and unspoken policy, through her actions and failure to act, in which Five Points CF staff did not report and turned a blind eye to the warning signs of physical abuse of inmates by correction officers.

281. SUPT. LAMANNA was deliberately indifferent to a serious risk to the safety of all inmates, including MR. WEST, at the hands of correction officers at Five Points CF.

282. The deliberate indifference of SUPT. LAMANNA led to the physical abuse of MR. WEST.

283. MR. WEST suffered emotional and psychological pain, physical illness, and other damages as a result of this violation.

## PRAYER FOR RELIEF

**WHEREFORE,** JAMONE WEST prays for relief and demands judgment in his favor on each of the claims against defendants as follows:

a. That a jury find and the Court adjudge and decree that Plaintiff shall recover compensatory damages in the sum of $20,000,000, plus punitive damages in the sum of $5,000,000, against the defendants in punitive damages, plus $1 against the defendants in nominal damages, jointly and severally, together with interest.

b. That Plaintiff recover the costs of the suit herein, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

c. That Plaintiff be awarded such other and further relief as the Court shall deem just and proper.

Dated: New York, New York
July 17, 2025

ZMO LAW PLLC

BY:

ZACHARY MARGULIS-OHNUMA
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999

*Attorneys for Plaintiff Jamone West*